No. 18,801.

THE DENVER AND RIO GRANDE WESTERN RAILROAD
COMPANY *v.* JOHN RAY MARTY, JR., ET AL.
(353 P. [2d] 1095)

Decided August 2, 1960.

Mr. T. A. WHITE, Mr. MARION R. SMYSER, for plaintiff
in error.

Mr. DEAN C. MABRY, for defendants in error.

*In Department.*

Opinion by Mr. Justice Doyle.

The parties will be referred to as they appeared in the trial court. Plaintiff instituted the action in the district court of Las Animas County to recover freight charges claimed to be due and owing for transportation of a carload of barley from Hayden, Colorado, to Trinidad. The complaint alleged that the amount of $852.84 was due and unpaid. The defendants were partners in the Bancroft-Marty Feed and Produce Company in Trinidad, Colorado. They interposed a counterclaim that alleged that the agent of plaintiff negligently misstated the freight rate; that they relied on his statement to their damage in the amount of the difference between the actual freight rate and the amount which it would have been had the quotation of plaintiff's agent been correct.

Trial was had to a jury and at its conclusion the trial court directed a verdict in favor of plaintiff on its complaint. At the same time the court submitted the counterclaim to the jury and this latter verdict was in favor of the defendants in the full amount demanded by the counterclaim.

Plaintiff seeks a reversal of the judgment entered on the jury verdict awarding damages to the defendants on their counterclaim.

The evidence at the trial established that some time prior to September 20, 1956, the defendant Jack Marty learned that a carload of barley was available for purchase from the Hayden Grain Company of Hayden, Colorado. Marty testified that he decided to buy it provided the freight costs were sufficiently low to permit him to resell the barley at a profit. On September 20, 1956, he called the freight agent of the plaintiff in Trinidad and explained to him why it was important for him to know the exact rate from Hayden to Trinidad. He was careful to spell out the word "Hayden" to the freight agent. The

latter informed Marty that he would have to wire the Denver office for the correct rate. He then proceeded to make this inquiry, but did so under the mistaken belief that the rate in question was from the town of Husted to Trinidad, and he requested this rate. The reply was that the rate from Husted to Trinidad was 30¢ per cwt. This was the rate admittedly quoted to Marty by the freight agent. Marty placed the order in the belief that this was the rate. A few days later, on September 26, 1956, the car arrived in Trinidad. It was only then that the freight agent, realizing his mistake, called Marty and advised him that he would have to wire Denver for the correct rate. Marty had, however, resold the barley on the assumption that his freight cost was 30¢ per cwt. It turned out that the rate from Hayden to Trinidad was 69¢ per cwt. Marty refused to pay the 69¢ rate and tendered a check for $370.80 which was refused by the railroad.

In urging that the judgment on the counterclaim is invalid and should be reversed, plaintiff presents the following points:

1. The trial court erred as a matter of law in not directing a verdict against defendants on their counterclaim because the recovery of damages on the counterclaim constituted a rebate to defendants contrary to the policy set forth in C.R.S. '53, 115-3-5 (3).

2. Even if a cause of action exists at law upon which the counterclaim could be based, the mere fact that plaintiff's agent misunderstood what defendants told him did not constitute evidence of negligence sufficient to submit the counterclaim to the jury.

3. The instructions given by the trial court were inconsistent with one another and contrary to both the law and the evidence.

Since we have determined that point 1 above is good and that the judgment must be reversed, it is unnecessary to discuss points 2 and 3.

The question we are called upon to determine may be formulated as follows:

*May a shipper recover damages in a tort action from a railroad as a result of the negligent misquotation of a freight rate by an agent of the railroad on an intrastate shipment?*

The pertinent provision of the statute is C.R.S. '53, 115-3-5 (3) which provides as follows:

"Except as in this section otherwise provided, no public utility, shall charge, demand, collect or receive a greater or less or different compensation for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered, than the rates, tolls, rentals, and the charges applicable to such produce or commodity or service as specified in its schedules on file and in effect at the time, nor shall any such public utility refund or remit, directly or indirectly, in any manner or by any device, any portion of the rates, tolls, rentals and charges so specified, nor extend to any corporation or person any form of contract or agreement or rule or regulation or any facility or privilege except such as are regularly and uniformly extended to all corporations and persons; provided, that the commission may by rule or order establish such exceptions from the operation of this prohibition as it may consider just and reasonable as to each public utility."

We proceed on the premise that the commitment given by the agent of the railroad would be binding on it in the absence of the above statute. 2 *Hutchinson, Carriers,* Sec. 806 (3d ed. 1906). However, the general rule which appears to be followed uniformly without significant deviation is that statutory policy against discriminatory rates and rebates precludes a shipper from asserting a claim, counterclaim or defense upon the basis that there was negligence or mistake in the quotation of the rates. See the numerous cases cited in 9 Am. Jur., *Carriers,* Sec. 160. The policy of the law was well expressed by the late Mr. Justice Hughes in *Louisville*

& *Nashville R.R. v. Maxwell,* 237 U.S. 94, 59 L. Ed. 853, 35 Sup. Ct. 494 as follows:

"Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of its interstate commerce in order to prevent unjust discrimination."

This principle has been applied in numerous instances to fact situations like those which appear in the present case. *Schenberger v. Union Pacific R.R. Co.,* 84 Kan. 79, 113 Pac. 433; *Atlantic Coast Line Ry. Co. v. Bristol Steel & Iron Works, Inc.,* 30 F. Supp. 726; *Atlantic Coast Line Ry. Co. v. Wanamaker Chemical Co., Inc.,* 216 S.C. 226, 57 S.E. (2d) 311; *Pettibone v. Richardson,* 126 F. (2d) 969 (7th Cir. 1942). See also the cases collected and annotated in 83 A.L.R. 245. The author of this note concludes that the overwhelming majority of decisions have denied a recovery based on misquotation of rates.

■ Defendants' counsel ably argues that even though the statute and the cases render a contract contrary to the policy of the statute unenforcible, it should not prevent the assertion of a claim based wholly upon tort; that to give effect to the statute to prevent such a claim deprives the claimant of important common law rights. However, as we read the statute, it prohibits rebates regardless of the legal theory upon which they are based. To hold that the statute affects contract claims only and is not applicable to demands growing out of the rate misquotation which arise on a tort theory would effectually nullify this statute and the policy set forth therein. Thus the strong policy of the statute

would become meaningless if it could be circumvented by merely developing a different legal theory.

Defendants argue that the federal cases should not serve as guides because the United States statutes are substantially different from the Colorado statutes in that they consist of a complete code which provides penalties and other remedies. Examination of the pertinent federal statute (49 U.S.C., Sec. 6 (7) ) convinces us that the prohibitions in the federal statute and those in our own statute are substantially the same. Both seek to achieve the same policy which is prohibition of rebates and discriminatory practices. Our statute, like the federal statute, seeks to promote uniform and non-discriminatory freight rates.

Defendants rely on early federal decisions such as *Pond-Decker Lumber Co. v. Spencer,* 86 Fed. 846 (5th Cir. 1898). The facts of this case are substantially different from those which are present in the case at bar. Other early federal decisions cited by defendants seem inconsistent with the holdings of the Supreme Court of the United States in *Illinois Central R.R. Co. v. Henderson,* 226 U.S. 441, 57 L. Ed. 290, 33 Sup. Ct. 176 and *Louisville & Nashville R.R. Co. v. Maxwell,* supra. Other cases cited by the defendants are based upon statutory remedies which were formerly granted by the federal act but which cannot be read by implication into our statute. From the silence of the General Assembly in this area of remedies, it is to be inferred that no deviations from the policy expressed in the statute were intended.

A further argument of defendants is that the refusal to recognize a right of action based upon tort deprives them of a claim in negligent misrepresentation contrary to the demands of the constitution of Colorado and of the United States. The contention that the General Assembly cannot modify common law rights was considered and rejected in *Vogts v. Guerette,* 142 Colo. 527, 351 P. (2d) 851.

The judgment is reversed and the cause remanded with directions to dismiss the defendants' counterclaim

MR. CHIEF JUSTICE SUTTON and MR. JUSTICE KNAUSS concur.