No. 45,484

GRAVES TRUCK LINE, INC., a Corporation, *Appellee,* v. HY PLAINS
DRESSED BEEF, INC., a Corporation, *Appellant.*

(462 P. 2d 130)

Opinion filed
December 6, 1969.

*B. G. Larson,* of Dodge City, argued the cause, and was on the brief for
the appellant.

*Don C. Smith,* of Dodge City, argued the cause and *R. R. Mitchell* and *David
Patton* both of Dodge City were with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This is an action to recover the balance allegedly due for transporting twenty-nine shipments of dressed beef from Dodge City, Kansas, to various out-of-state destinations. Judgment was rendered in favor of the plaintiff, and the defendant has appealed.

There is little dispute regarding the material facts. Between April 27, 1964, and June 5, 1964, the plaintiff, often referred to herein as Graves, carried twenty-nine shipments of dressed beef from Dodge City, where the defendant Hy Plains had its plant, to the metropolis of Wichita, whence it was transshipped to terminals in other states. Graves quoted and collected a rate based on an intrastate rate of forty cents (40¢) per hundredweight to Wichita and an interstate rate from Wichita to points of ultimate destination. In each instance the combined total of the intrastate and interstate rates was less than the current class rate.

By way of specific example, on shipments consigned to Arlington, Texas, cargo was first transported by Graves to Wichita, where it was interlined with Jones Truck Line of Springdale, Arkansas, to its final destination at Arlington. The total charge from Dodge City to Arlington quoted by Graves and paid by Hy Plains was $1.41 per hundredweight, computed by adding a rate of 40 cents per hundredweight to Wichita and $1.01 from Wichita to Arlington. This total charge was 50 cents per hundredweight less than the published class rate of $1.91. Other rates quoted by Graves were computed in like fashion and were likewise less than the class rates then in force.

Investigation conducted by the Interstate Commerce Commission disclosed that Hy Plains was undercharged on the entire twenty-nine shipments in a total amount of $4,511.60. At the behest of the Commission, Graves commenced this action to recover the entire undercharge.

In its answer to the plaintiff's petition, the defendant alleged that the original charges had been quoted by Graves as being correct; that had defendant not been misled by Graves, it would have used other means of transportation; and that because of Graves' misstatements and misrepresentations the defendant had been damaged and was entitled to a setoff in the entire amount for which it was sued.

Trial was to the court, where Hy Plains orally confessed the petition filed by Graves and stated it was "obligated and indebted to the plaintiff in the amount of $4,511.60." Trial then proceeded on Hy Plains' setoff. Evidence was introduced by Hy Plains, and Graves offered no evidence. When trial was concluded the court found as a matter of law that Hy Plains was not entitled to a setoff and rendered judgment for Graves in the amount asked.

The defendant poses two questions on appeal. They may be paraphrased as follows: 1. May Hy Plains, as a matter of law, be charged a class rate rather than a duly published rate which is lesser in amount? 2. May Graves, as a matter of law, misquote freight rates without being liable to Hy Plains for damages caused thereby?

The first question proposed is somewhat enigmatic. However, in essence it seems to be that it would be unfair to require payment to Graves on a class rate when the published rate of a competing truck line was less than the class rate.

Testimony is found in the record that a published rate of $1.65 per hundredweight was charged by Frozen Food Express for shipping dressed beef to Arlington. This rate contrasts with the $1.91 class rate charged by Graves. One of the defendant's methods of computing its damage was based on this disparity and others similar thereto. In our judgment this evidence presents no justiciable issue and is wholly irrelevant to the central point of this lawsuit, as we trust will more fully appear from our subsequent discussion.

The obligations of a common carrier engaged in interstate commerce are governed by the federal Interstate Commerce Act, whose interpretation is a matter for the federal courts. These facts of commercial life were given early recognition by the courts of this state. (See *Schenberger v. Railroad Co.*, 84 Kan. 79, 113 Pac. 433, and cases cited therein.)

Under the provisions of the Act, common carriers are required to publish, file and post tariffs, or schedules of rates, and they are obliged to adhere to their published rates. (13 Am. Jur. 2d, Carriers, § 107, p. 647.) Section 217 (*b*) of the Interstate Commerce Act (49 U. S. C. A., § 317 [*b*], p. 292) applies specifically to common carriers by motor vehicle and this statute provides in substance that no motor carrier shall charge or collect more, or less, than the rates and charges specified in its published tariffs, nor may the

carrier refund or remit in any wise any portion of the rates and charges so specified.

Cases have arisen in this court more than once respecting transportation charges. Our latest pronouncement on the subject of undercharges is *Kanotex Refining Co. v. Atchison, T. & S. F. Rly. Co.*, 142 Kan. 139, 46 P. 2d 16, which we believe is of controlling significance in the present case. The facts in *Kanotex* were as follows: Kanotex had an opportunity to buy some three hundred carloads of crude oil in Oklahoma City for shipment to its refinery in Arkansas City. The published tariff on crude oil between those cities was ten cents per hundredweight. Before buying the oil, Kanotex made an agreement with Santa Fe wherein the latter agreed it would immediately file and make effective a tariff of 6 cents per hundredweight. Relying on this agreement, Kanotex bought the oil and shipped it over Santa Fe lines, but the carrier failed to publish the new rate in time for it to become effective as to the Kanotex oil. Instead, Santa Fe demanded and collected the full 10 cent rate.

Kanotex sued to recover damages for breach of contract, but recovery was denied. The substance of the holding is fairly reflected in the syllabus:

"Legal rights existing between a shipper and a carrier as to rates in interstate commerce are measured by the tariffs or rates published and on file with the interstate commerce commission. (Syl. ¶ 1.)

"No deviation from such published rates can be made on any pretext, and an agreement, the purport of which is to permit the collection of charges at other than the published rates, is of no binding force or effect. (Syl. ¶ 2.)

"No act or omission of the carrier can estop it from enforcing payment of the full amount of the charges due, computed according to the published rates on file with the interstate commerce commission at the time of the shipment." (Syl. ¶ 3.)

In *Kanotex* this court followed and applied the rule generally adopted in this country, a succinct statement of which is found in an annotation in 88 A. L. R. 2d at page 1392:

"Although it is often apparent that one who is required to pay shipping charges in excess of the amount which he originally contemplated has suffered pecuniary damages as a result thereof, the courts have been almost unanimous in holding that no action to recover such damages from the carrier will lie, since to do so would amount to a preferential and unlawful rebate."

In pleading its claim of setoff, Hy Plains saw fit to allege that it was misled by Graves and had been damaged by the misstatements

and representations of Graves' agents. However, the evidence set out in the record does not indicate fraud on the plaintiff's part, and no claim of bad faith was advanced in defendant's brief or in oral argument.

But even if Graves had been guilty of misrepresentation, the result of this litigation would remain unaffected. In 13 Am. Jur. 2d, Carriers, § 108, p. 650, the rule is set out:

". . . Moreover, consistent with the general policy of allowing no one to avoid payment of lawful freight charges, the courts have dismissed the question of the carrier's honesty or good faith in understating its rates and have held that the intentional misrepresentations are not a defense to recovery by the carrier."

See, also, 13 C. J. S., Carriers, § 393, pp. 873-876 and annotation in 88 A. L. R. 2d, pp. 1388, 1389.

In *Kanotex,* this court discussed the effect of the contracting parties' good faith on a transaction resulting in an undercharge and came up with this observation:

"Good faith and laudable motive or the converse thereof do not enter into the matter, however. . . ." (p. 148.)

The defendant suggests that the rationale of *Kanotex* and kindred cases should be deemed to have no application where class rates are involved. No authority is cited in support of this contention and our limited research has failed to reveal any. While we make no pretense of being learned in the field of public transportation with its accompanying schedules, tariffs and rates, it is our limited understanding that class rates are those which apply to various commodities within a general classification while a commodity rate, by contrast, refers to a particular or specific commodity. (*New York v. United States,* 331 U. S. 284, 91 L. Ed. 1492, 67 S. Ct. 1207; *Board of Public Utility Com'rs v. United States,* 21 F. Supp. 543; 13 C. J. S., Carriers, § 276, p. 627.)

We see no practical distinction between class and commodity rates so far as this case is concerned. We assume that rates in both categories are established pursuant to the provisions of the Interstate Commerce Act and the rules and regulations which have been promulgated thereunder. As we read the Act all rates must be just and reasonable; must be filed and published; and must not result in favoritism or preferential treatment. Hy Plains does not contend that the class rate to which it objects was not published or that it was not in effect when all of its shipments were transported. No reason has

been advanced for presuming that class rates, when applicable, are not equally as binding and obligatory upon shipper and carrier alike as are rates for specified commodities.

Although at first glance the result reached in this case may seem harsh so far as Hy Plains is concerned, we must bear in mind that "the purpose of the interstate commerce act is to prevent discrimination or preference . . ." (*Kanotex v. Atchison, T. & S. F. Rly. Co.*, supra, p. 148.)

The public policy against discrimination inherent in the requirement that carriers adhere to published tariffs, precludes a shipper from asserting a claim, counterclaim or defense in an action brought by a carrier to recover the full legal charges for transportation. (13 Am. Jur. 2d, Carriers, § 110, p. 651.) Hence courts have been zealous in ruling that a carrier may not, under any pretext, exact transportation charges which are more, or less, than the published, filed and effective rates. To hold otherwise might well open the door to subterfuge, artiface, evasion and chicanery.

Finally, the defendant calls attention to the Harris Act. (49 U. S. C. A., § 304 (*a*).) Under the terms of this federal statute, enacted in September, 1965, an action may be commenced for the recovery of "reparations", which are defined as damages resulting from transportation charges to the extent the Commission, on complaint, finds them to be unjust, unreasonable, unjustly discriminatory, unduly preferential or unduly prejudicial. Since the Harris Act was adopted more than a year after the transactions between Graves and Hy Plains were concluded, it obviously can not control the disposition of this lawsuit, and so much was conceded by Hy Plains at oral argument. Neither do we view the enactment of the Harris Act as effecting a sufficient change in public policy, as expressed by Congressional act, to justify us in reversing this case in the face of our long standing precedents.

In conclusion we deem it appropriate to quote the picturesque language of Justice Dawson in *Farrar v. Perkins*, 122 Kan. 141, 146, 251 Pac. 440, as typifying the principle by which courts have long been bound in cases involving transportation rates.

". . . One specific matter which is regulated by statute with censorious particularity is that of freight rates. The carrier may not charge more and may not accept less than the regularly authorized freight tariffs permit. If the correct freight charge is not paid the carrier is bound to exhaust its available remedies to collect the balance due and compromises which would or might savor of favoritism or of rebates to particular shippers are against

public policy. Like a tax collector the railway company must collect the proper charge and may not settle for less. . . ."

No error appears in the judgment entered by the trial court and it is affirmed.